IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | INFORMATION |
| Plaintiff, | ) | |
| v. | ) | CASE NO. 1:19 CR 194 |
| ROBERT J. ROSENSTEIN, | ) | Title 18, Section 1347, United States Code |
| Defendant. | ) | JUDGE POLSTER |

GENERAL ALLEGATIONS

At all times relevant to this Information:

**A.    Defendant and His Medical Practice**

1.    ROBERT J. ROSENSTEIN ("ROSENSTEIN") was a doctor of podiatric medicine licensed by the State of Ohio on or about January 1, 1979.

2.    Affiliated Podiatrists, Inc. ("Affiliated") was a corporation organized under the laws of the State of Ohio on or about August 23, 1984. Affiliated was located at 7230 Mentor Avenue, Suite 311, Mentor, Ohio, in the Northern District of Ohio. ROSENSTEIN was the president and sole shareholder of Affiliated.

3.    Community Foot and Ankle of Mentor, Inc. ("CFAM") was a corporation organized under the laws of the State of Ohio on or about June 25, 2014. CFAM was located at 7230 Mentor Avenue, Suite 311, Mentor, Ohio, in the Northern District of Ohio. ROSENSTEIN controlled the daily operations of CFAM and was the *de facto* owner of CFAM.

4. Individual 1 (known to the United States Attorney but not charged herein) was a doctor of podiatric medicine licensed by the State of Ohio on or about January 1, 1976. Individual 1 was the purported owner of CFAM.

**B.  Medicare and Medicaid**

5. Congress enacted the Medicare Program on July 30, 1965, under Title XVIII of the Social Security Act. Medicare provided medical insurance benefits to any person age 65 or older and to certain disabled persons. Medicare was a health care benefit program within the meaning of Title 18, United States Code, Sections 24(b) and 1347; it was a public plan, affecting commerce, under which medical benefits, items and services were provided to individuals.

6. Medicare Part B helped cover doctors' services, outpatient care, and supplies, including podiatric care for injury, disease, or other medical conditions affecting the foot, ankle, or lower leg, when they were ordered by a doctor and medically necessary.

7. The Centers for Medicare & Medicaid Services ("CMS") was a federal agency within the United States Department of Health and Human Services ("HHS") and was responsible for administering the Medicare and Medicaid programs. CMS had the authority to make coverage and medical necessity determinations.

8. Medicaid was a federal health care benefit program designated to provide medical services, equipment, and supplies to certain individuals and families with low income as outlined in the Social Security Act (Title 42, United States Code, Section 1396 *et seq.*). Medicaid was a health care benefit program within the meaning of Title 18, United States Code, Sections 24(b) and 1347; it was a public plan, affecting commerce, under which medical benefits, items and services were provided to individuals. HHS historically funded approximately sixty percent of Ohio's Medicaid program. The Ohio Department of Medicaid ("ODM") administered the

Medicaid program in Ohio. Eligible Medicaid recipients obtained Medicaid coverage directly through ODM, also known as fee-for-service coverage, or through a Medicaid Managed Care Organization ("MCO"), which contracted with ODM to manage some Medicaid recipients' benefits. Ohio providers claimed Medicaid reimbursement from ODM pursuant to written provider agreements. ODM and MCOs received, processed, and paid those claims according to Medicaid rules, regulations, and procedures.

**C.      Claims Administration and Reimbursement**

9.      Under the Medicare Program, medical providers, such as clinics, physicians, and other health care providers, applied for a Medicare Provider Identification Number ("PIN") for billing purposes. In the enrollment application, a provider was required to disclose to Medicare any person or company who held an ownership interest of 5% or more or who had managing control of the provider.

10.     Similar to Medicare, under the Ohio Medicaid program, medical providers were required to enter into a "Provider Agreement" with ODM and applied for a Medicaid provider number. In the enrollment application, a provider was required to disclose to Medicaid any person or company who held a controlling interest of 5% or more or who had managing control of the provider.

11.     By becoming a participating provider in Medicare and Medicaid, enrolled providers agreed to abide by all applicable federal and state statutes, rules, regulations and guidelines, including policies and procedures governing reimbursement.

12.     To be reimbursed by Medicare and Medicaid, claims for reimbursement were required to set forth, among other things, the beneficiary's name, the date the services were provided, the cost of the services, and the name and identification number of the physician or

other health care provider who rendered the services. Providers conveyed this information to Medicare and Medicaid by submitting a claim, either electronically or using a paper form, that contained the required information identifying the provider, patient, and services rendered.

13.  Health care providers could only submit claims to Medicare and Medicaid for services they rendered, and Medicare and Medicaid only paid for services that were actually rendered by qualified individuals. When an individual medical provider was associated with an office, Medicare required that the individual provider's PIN be placed on the claim submitted to Medicare in addition to the PIN assigned to the office. Medicaid likewise required the claim to list the Medicaid provider number for the rendering provider.

14.  Medicare and Medicaid required complete and accurate patient medical records so that Medicare and Medicaid could verify that the services were provided as described on the claim form. These records were required to be sufficient to permit Medicare and Medicaid, through CMS and other contractors, to review the appropriateness of payments made to the health care provider.

**D.   Revocation of Medicare and Medicaid Billing Privileges**

15.  From in or around 1980 through on or about May 2, 2013, ROSENSTEIN was enrolled as a participating provider with, and submitted claims to, Medicare and Medicaid.

16.  On or about May 2, 2013, ROSENSTEIN was convicted of conspiracy to commit bank fraud in violation of Title 18, United States Code, Section 371.

17.  On or about December 11, 2013, the State Medical Board of Ohio suspended ROSENSTEIN's Ohio medical license, and subsequently reinstated it on or about March 12, 2014.

18.     On or about January 22, 2014, pursuant to Title 42, Code of Federal Regulations, Section 424.535, CMS revoked ROSENSTEIN from participation in the Medicare Program and terminated his billing privileges for a period of three years, retroactive to May 2, 2013, as a result of his conviction. ROSENSTEIN did not apply for reenrollment in the Medicare program.

19.     As of May 2, 2013, ROSENSTEIN was not eligible to provide services to Medicare recipients and could not receive payments from Medicare. Affiliated also was not eligible to receive payments from Medicare for claims for services rendered by ROSENSTEIN.

20.     On or about June 25, 2014, ROSENSTEIN caused to be filed with the Ohio Secretary of State Articles of Incorporation for CFAM. ROSENSTEIN began working as the Medical Director of CFAM at or around that time.

21.     On or about July 13, 2014, ROSENSTEIN caused to be filed an enrollment application for CFAM with Medicare. The enrollment application was signed by Individual 1 and did not list ROSENSTEIN as having a direct or indirect ownership or controlling interest in CFAM. CMS approved CFAM's Medicare enrollment application and issued a Medicare PIN to Individual I on or about November 3, 2014.

22.     On or about January 14, 2015, ROSENSTEIN caused to be filed a Provider Agreement for CFAM with Medicaid. The Provider Agreement did not list ROSENSTEIN as having a direct or indirect ownership or controlling interest in CFAM. ODM approved CFAM's Medicaid Provider Agreement and issued a Medicaid provider number to Individual I on or about January 14, 2015.

23.     On or about November 18, 2016, ODM revoked ROSENSTEIN's participation in Medicaid and terminated his billing privileges. ROSENSTEIN did not apply for reenrollment in the Medicaid program.

5

24. As of November 18, 2016, ROSENSTEIN was not eligible to provide services to Medicaid recipients and could not receive payments from Medicaid. CFAM also was not eligible to receive payments from Medicaid for claims for services rendered by ROSENSTEIN.

COUNT 1
(Health Care Fraud, in violation of 18 U.S.C. § 1347)

The United States Attorney charges:

25. Paragraphs 1 through 24 of the General Allegations are incorporated herein and realleged by reference.

26. From on or about July 14, 2014, through on or about May 9, 2018, in the Northern District of Ohio, Eastern Division, Defendant ROBERT J. ROSENSTEIN knowingly and willfully executed a scheme and artifice to defraud a health care benefit program, that is, Medicare and Medicaid, and to obtain money and property owned by and under the custody and control of Medicare and Medicaid, by means of false and fraudulent pretenses, representations, and promises, in connection with the payment for health care benefits, items and services, by submitting and causing to be submitted to Medicare and Medicaid claims for reimbursement for services that he was excluded from performing.

27. It was part of the scheme and artifice that ROSENSTEIN performed medical services at CFAM for Medicare and Medicaid recipients even though he knew that he was excluded from participation in Medicare and Medicaid.

28. It was further part of the scheme and artifice that ROSENSTEIN concealed from Medicare and Medicaid his performance of medical services at CFAM by:

(a) Failing to disclose to Medicare and Medicaid that he was the *de facto* owner of, and held a management interest in, CFAM;

(b) Creating medical records that identified Individual 1 as the rendering physician for Medicare and Medicaid recipients when, in truth and fact, ROSENSTEIN performed the medical services; and

(c) Using the Medicare PIN, Medicaid provider number, and other billing identifiers of Individual 1 to submit claims to Medicare and Medicaid for medical services actually provided by ROSENSTEIN.

29. It was further part of the scheme and artifice that ROSENSTEIN received, retained, and endeavored to receive and retain reimbursement payments from Medicare and Medicaid to which he was not entitled.

30. As a result of ROSENSTEIN's false and fraudulent claims, Medicare was billed for the services that ROSENSTEIN was prohibited from providing, in the amount of approximately $968,938.89.

31. As a result of ROSENSTEIN's false and fraudulent claims, Medicaid was billed for the services that ROSENSTEIN was prohibited from providing, in the amount of approximately $219,330.71.

All in violation of Title 18, United States Code, Section 1347.

FORFEITURE
(18 U.S.C. § 982(a)(7))

The United States Attorney further charges:

32. Paragraphs 1 through 31 are incorporated herein and realleged by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 982(a)(7). As a result of the foregoing offense, Defendant ROBERT J. ROSENSTEIN shall forfeit to the United States all property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense; including, but not limited to, the following:

  (a) $75,000.00 of the proceeds of the sale of the following real property: 7230 Mentor Avenue, Mentor, Ohio (Permanent Parcel Number: 16A0010000190).  The property was sold to a third party on or about November 30, 2018.

## SUBSTITUTE PROPERTY

In the event that any property subject to forfeiture under 18 U.S.C. § 982(a)(7), as a result of any act or omission of the defendant:

  (a) cannot be located upon the exercise of due diligence;

  (b) has been transferred or sold to, or deposited with, a third party;

  (c) has been placed beyond the jurisdiction of the court;

  (d) has been substantially diminished in value; or,

  (e) has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) [as incorporated by 18 U.S.C. § 982(b)(1)], to seek forfeiture of any other property of the defendant up to an amount equivalent to the value of the forfeitable property described above.

JUSTIN E. HERDMAN
United States Attorney

By: *Edward F. Feran* (signature)
Edward F. Feran, Chief
General Crimes Unit